THE STATE OF DELAWARE, on the relation of JANUAR D. BOVE, JR., Attorney General of the State of Delaware,
Plaintiff,

*vs.*

JOSEPH AMATO, JOHN GENTILE, RICHARD SAXTON, JOHN AMATO, THE ESTATE OF LOUISA ALESSANDRINI, GENE ALESSANDRINI, Executor of the Estate of Louisa Alessandrini,
Defendants.

THE STATE OF DELAWARE, on the relation of JANUAR D. BOVE, JR., Attorney General of the State of Delaware,
Plaintiff,

*vs.*

STANLEY SMULSKI, ARCHIE DIXON, and HENRY P. GIBBONS,
Defendants.

THE STATE OF DELAWARE, on the relation of JANUAR D. BOVE, JR., Attorney General of the State of Delaware,
Plaintiff,

*vs.*

JOSEPH DIROSA, DANIEL MARUCCI, ALBERT DISALVO, MICHAEL BENICKY, ANGELO MARABITO, EUGENE SMALLWOOD, and DANIEL M. DELCOLLO,
Defendants.

*New Castle, February 6, 1963.*

*E. Norman Veasey* and *Thomas Herlihy, III, Deputy Attys. Gen.,* for the State.

*Joseph J. Longobardi, Jr.,* of Longobardi & Schwartz, Wilmington, for defendants in Civil Action No. 1708.

*Norman N. Aerenson,* of Aerenson & Balick, Wilmington, for defendants in Civil Action No. 1707.

*Robert B. Walls, Jr.,* of Coxe, Booker, Walls & Cobin, Wilmington, for defendant Michael Benicky in Civil Action No. 1709.

*John F. Hyde,* Wilmington, for defendants Joseph DiRosa, Daniel Marucci, Albert DeSalvo, Eugene Smallwood and Daniel M. Delcollo in Civil Action No. 1709.

*David Snellenburg, 2nd,* of Killoran & VanBrunt, Wilmington, for defendant Angelo Marabito in Civil Action No. 1709.

SEITZ, Chancellor: These are three actions by the State of Delaware on the relation of the Attorney General seeking in each case a preliminary injunction to restrain a building owner from using, leas-

ing, subleasing, operating and/or allowing any person to operate and/or use an identified place in violation of the gambling laws of the State. The State also asks that the other named defendants be enjoined from continuing to remain on, visit on, or use the various premises and to operate, conduct, or permit to exist thereon any illegal gambling contrary to 11 *Del.C.* § 669. These actions are brought under the provisions of 10 *Del.C.* §§ 7101-7109, giving this court jurisdiction to enjoin certain nuisances, one of which is defined to be "illegal gambling". The defendants are charged with participating in or permitting illegal gambling to take place in certain identified places. More particularly, the places are said to be used for the receiving and recording of horse bets in violation of 11 *Del.C.* § 669. The defendants resist the applications, and this is the decision thereon.

Defendants raised the issue that the complaints were not verified in the manner required by *Chancery Rule* 3(aa) *Del.C.Ann.* and argued that no preliminary injunctions could issue under *Chancery Rule* 65. The State's counsel thereafter sought by amendment, and was granted permission, without objection, to file a verification complying with the court rule. I turn now to a consideration of the applications for preliminary injunctions and first consider the pertinent legal principles.

The State brings these actions under the provisions of 10 *Del.C.* §§ 7101-7109 as amended. Section 7102 provides as follows:

> "Whoever uses, occupies, establishes, or conducts a nuisance, as defined in section 7101 of this title, or aids or abets therein, and the owner, agent, or lessee of any interest in any such nuisance, together with the persons employed in or in control of any such nuisance by any such owner, agent, or lessee, shall be guilty of maintaining a nuisance and shall be enjoined as provided in this chapter."

Section 7101 defines a "nuisance" to mean "any place, as defined in this section, in or upon which, inter alia, * * * illegal gambling is conducted, permitted, continued, or exists * * *". Thus, the use of a place for illegal gambling constitutes a statutory nuisance.

The defendants tacitly concede that the acts charged to the various defendants are acts which, if proved, would constitute illegal gambling under 11 *Del.C.* § 669.

Since these are applications for preliminary injunctions the court is concerned with the pertinent provisions of 10 *Del.C.* § 7105 which provides as follows:

"(d) A Copy of the complaint together with a notice of the time and place of the hearing of the application for a temporary injunction shall be served upon the defendants at least five days before the hearing. * * *"

"(e) Each defendant so notified shall serve upon the complainant, or his attorney, a verified answer on or before the date fixed in the notice for the hearing and such answer shall be filed with the Register in Chancery wherein the cause is triable, * * *."

"(f) If upon the hearing the allegations be sustained to the satisfaction of the Court, the Court shall issue a temporary injunction without bond restraining the defendants and any other person or persons from continuing the nuisance. * * *"

The quoted provisions of § 7105 show that the test on the present applications is whether the allegations made by the State have been sustained to the satisfaction of the court. I take this to mean nothing more nor less than that the court should apply the principles governing the granting of preliminary injunctions generally. One formulation of the governing principle is that an applicant must show a reasonable probability of ultimate success before it will be granted. Is there a reasonable probability that the State, after final hearing, will be granted permanent injunctions? Defendants contend that the record does not support such a conclusion. I turn to that issue.

The court is greatly assisted in determining the present applications by certain statutory language and undisputed facts.

Parenthetically, I pause to note that defendants are in default of the provisions of 10 *Del.C.* § 7105(e) because they did not file a verified answer, or indeed any answer, on or before the time of the hearing on the applications for preliminary injunctions. However,

I shall consider the applications apart from this factor because it may have been inadvertent. Counsel for all defendants in Civil Actions 1707 and 1708 stipulated after the preliminary injunction argument that answers or motions need not be filed until five days after the decision on the present applications.

Since the court is concerned with testing the probability of the State's ultimate success I turn to the significant portion of 10 *Del.C.* § 7106 which provides as follows:

> "(b) In the action evidence of the general reputation of the place, or an admission, or finding of guilt of any person under the criminal laws against prostitution, lewdness, or assignation at any such place, shall be admissible for the purpose of proving the existence of the nuisance, and shall be prima facie evidence of such nuisance and of knowledge of and of acquiescence and participation therein on the part of the person charged with maintaining the nuisance as defined in this chapter."

In each case it is charged under oath that the place involved has a reputation as a place where horse bets are received and recorded contrary to the statute. Defendants do not deny that these statements are proper evidence of general reputation, rather they suggest that the statute is inapplicable. Their reasoning is that 10 *Del.C.* §§ 7101-7109 have been "on the books" for many years but that the definitions of nuisances did not embrace "illegal gambling". The Legislature recently amended the definition (§ 7101) by adding "illegal gambling" to the nuisance definition. However, § 7106 was not amended. Thus, defendants argue that the effect accorded that Section must be limited to cases of prostitution, lewdness or assignation.

The use of the disjunctive "or" in § 7106 makes it clear that it deals with three mutually independent types of evidence. The first is "general reputation", the second an "admission" and the third "a finding of guilt". Clearly, there was no need to amend the "general reputation" provision of the statute insofar as illegal gambling was concerned because its language was fairly applicable without change. I am therefore satisfied that the general reputation provision of § 7106 is applicable to these cases. I need not consider, as the State claims, that such evidence would be admissible in any event. Since I am

not deciding whether an "admission" is here involved, I pass over the effect of that provision. Clearly, however, § 7106 does not authorize the admissibility of a finding of guilt in connection with illegal gambling. Whether that portion of the statute was not amended because of an oversight or otherwise, is of no concern to the court. It is suggested by the State that evidence of a conviction is admissible apart from the statute. I need not pass on that point here because I am now considering the effect to be accorded § 7106.

Defendants thus do not deny that the State's papers show that the identified premises have what amount to general reputations as places where illegal gambling takes place. Since I have decided that at least the "general reputation" provision of § 7106 is applicable, it follows that such evidence, which is uncontradicted on the present record, is prima facie evidence of the nuisances alleged.

But it is not necessary to rest my determination of the present applications solely on the general reputations of the places involved. Whether considered in conjunction with reputations or apart from them, the present record sustains the allegations to the satisfaction of the court. I say this mindful of the fact that there is no direct evidence of betting or receiving and recording bets on horse races at any of the premises.

█ It is not necessary to show particular acts of illegal gambling in order to obtain relief under the statute. Compare *State ex rel. Halvorson v. Simpson*, 78 *N.D.* 440, 49 *N.W.2d* 790. Circumstantial evidence is a permissible basis of proof and in this type of case is often the only kind obtainable. Compare *State ex rel. Halvorson v. Simpson*, above; and see *State ex rel. Davis v. Brown*, 211 *Ala.* 266, 100 *So.* 224. I am also mindful that where circumstantial evidence is involved, the court must be even more vigilant to see that the only inference reasonably consistent with such evidence is that the place is used in the illegal manner charged.

The State must ultimately prove its charges by the preponderance of the evidence. I consider the record in each of the cases in the light of that standard and the nature of the applications.

I first consider *State v. Joseph Amato, John Gentile, Richard Saxton, John Amato, the Estate of Louisa Alessandrini and Gene Alessandrini, Executor of the Estate of Louisa Alessandrini.*

The complaint alleges that illegal gambling is taking place at 500 North Lincoln Street. Tax records of the City of Wilmington show the owner of the property to be the Estate of Louisa Alessandrini, while the records of the Register of Wills show that the defendant, Gene Alessandrini is the executor of the estate. The residential addresses of the defendants are all at places other than 500 North Lincoln Street.

The State's application is also supported by the joint affidavit of two police officers of the City of Wilmington. I summarize the parts of their affidavit upon which I rely in disposing of the present applications.

On November 13, 1962, they visited the premises of 500 North Lincoln Street, Wilmington, known as the 500 Sportsmen Club. They rang the bell and after about a minute's delay, they were admitted through an electrically controlled door by the defendant, John Gentile. On entering the first door which leads to a vestibule, they encountered another door which opened in the opposite direction so that it would be impossible for two persons to gain entrance into the club at one time. Upon entering the premises they observed one man sleeping on a sofa and three men sitting inside playing cards. They attempted to engage the defendant Joseph Amato in conversation regarding bookmaking activities and Amato stated that he had little education and did not know what they were talking about, a classic nonsequitur. While they were there, Joseph Amato sat at a desk at the rear of the Club. The desk had nothing on it except a telephone which rang eleven times in approximately ten minutes and each time Joseph Amato answered it and told the caller to "call back later" or "he is not here now". On one occasion he could not get the caller off the line and stated to the police officers, "he must be thick, he doesn't understand that you people are here". On checking the Club, the police officers could observe no type of entertainment.

On November 19, 1962, at about 2:08 P. M. the same police officers made another routine visit to the Club and were again admitted

by John Gentile and observed the same physical conditions of the structure. They then observed nine persons sitting around various tables and observed Joseph Amato sitting at the desk. The telephone rang 14 times in 15 minutes and each time Amato answered "I'm busy" or "I've got company". One of the police officers asked Amato what type of club it was. Amato stated that he did not know. The police officer asked how many members there were and Amato replied about 200. Amato stated that he and his brother and the defendant, Richard Saxton, were officers of the Club and that the Club was incorporated and has a charter.

The police officers observed that only three of the patrons still remained on the premises when they left some 15 minutes later.

On November 21, 1962, the same police officers made a visit to the premises and were admitted after a two-minute delay. The same physical conditions were observed. Joseph Amato and five unknown persons were inside the premises. The phone rang 14 times in ten minutes and each time Amato answered "not now". On one occasion a caller did not want to hang up and Amato asked the police, rhetorically of course, "Isn't he a thick head?"

On November 23, the same police officers made another routine visit to the same premises. They observed seven persons on the premises. Before they entered, John Gentile peeked through the window and returned to the inside of the Club and the police officers were admitted by Joseph Amato after a minute's delay. The telephone rang ten times and each time the defendant, Joseph Amato answered and said, "not now, we have visitors". While the police officers were at the premises, three persons attempted to enter and John Gentile answered the door and denied them admission.

On November 26, 1962, the police officers made another visit and the same conditions prevailed. This time the phone rang 18 times in 15 minutes and each time Joseph Amato answered and said, "not now, I have visitors" or "he isn't here". On Friday, November 30, 1962, from 11:00 A. M. to 1:25 P. M. one of the police officers, Coen, had the same premises under observation. He observed that at 11:20 A. M. Joseph Amato opened the premises and at that time entered carrying newspapers. About 11:25 A. M. John Gentile

entered the premises. From 11:25 to 1:25, 37 persons entered the premises and on each occasion had to knock on the door to gain entry and were admitted on each occasion either by Gentile or Amato. They stayed in the premises from five minutes up until 45 minutes.

Each of the defendants, Joseph Amato, John Gentile, Richard Saxton and John Amato, is known to the police officers to have a general reputation for participation in receiving and recording horse bets. The premises in question are known to police officers to have the reputation as a place where horse bets are received and recorded.

The method of operation employed in Wilmington by operators of horse betting parlors is described as follows: The hours are from 11:00 A. M. to 6:00 P. M. These hours coincide with the running of race tracks throughout the country. The bookmakers or operators will allow only known and trusted horse players into their place of business. They employ a doorman or lookout man, whose duties consist of constantly watching for the police and admitting known customers. Usually there are several locked doors leading into these places. The equipment or paraphernalia needed and used in the bookmaking rooms consists of racing papers and regular daily newspapers that carry the results and track programs. A radio is used in the receiving of results and prices paid by the various tracks. In receiving bets under present conditions the bookmaker either writes the bet down on a small slate of marble or on some similar object, which can be easily erased by a damp rag. When the bookmaker accumulates several bets he phones these bets to a confederate, or recorder, who makes a record of the bet, the amount and player. Many bookmakers do not write anything down and by keeping an open phone, they immediately relay the bets to the recorder. The location of the recorder is only known to the bookmaker, and while the bookie room may be located in the center of the city, the recorder, and the only evidence of gambling, can be anywhere in the county or state.

The defendant John Gentile filed an affidavit admitting that he was a member of the Club and he also stated that to the best of his knowledge and belief no arrests have ever been made at 500 North Lincoln Street for any offenses. The defendant Joseph Amato filed an affidavit stating that he is Secretary-Treasurer of the Club. He

added that to the best of his knowledge and belief no arrests have even been made on the premises.

The defendant John Amato filed an affidavit stating that he was president of the Club and had been since 1958. He states that no one has ever been arrested on the premises and went on to say that no one has ever been arrested in connection with 500 North Lincoln Street or in connection with the Club. Finally, he states that he has never been arrested for or convicted of a violation of the gambling laws of the State of Delaware. No affidavit was filed on behalf of the estate of Louisa Alessandrini.

The next case involves *State v. Stanley Smulski, Archie Dixon* and *Henry P. Gibbons*. The complaint alleges that illegal gambling is taking place at 217 Maryland Avenue, Wilmington. The tax records of the City of Wilmington show that the property is owned by the defendant, Henry P. Gibbons. The defendants are alleged to live at addresses all of which are other than 217 Maryland Avenue.

The State filed a joint affidavit by three police officers of the City of Wilmington in support of its application for a preliminary injunction. I now summarize the provisions I deem pertinent at this time.

On November 13, 1962, two of the police officers made a routine visit to the premises at 217 Maryland Avenue. Upon entering the premises they found five unknown persons sitting around reading daily racing publications such as the Armstrong Daily News Review and the Morning Telegraph and observed the defendant Stanley Smulski talking on the phone. He then placed the telephone sideways on its cradle so that it would not ring. He immediately left the premises and took up a position on the front steps and was observed as people attempted to enter the premises to say something to them. The persons would then continue on their way. The police officers observed in the premises a piece of venetian blind slat next to the telephone and a lead pencil. The patrons of the Club also immediately left after the police entered. The only person who remained was defendant Archie Dixon who is an operator at the Club. The police officers stayed about ten minutes. When they left, the defendant Smulski returned to the inside of the premises.

On November 19, 1962, at about 1:49 P. M. one of the police officers made a routine visit to the Club. Smulski immediately took up a position on the outside of the premises when the officer arrived, and two other persons who were inside the premises left. It was also observed that Smulski would speak to people who attempted to enter the premises and they would go on their way. The police officer stated that the defendant Dixon told him that he did not keep any old issues of the Armstrong and Telegraph on the premises since the last time he was arrested. Two Armstrong Daily News Reviews and one Morning Telegraph were observed on tables inside the premises. The piece of venetian blind slat was observed next to the telephone with a figure written on it. Dixon said that the venetian blind slat was used by him to make notations. When the police officer left, Smulski returned to the inside of the premises.

On November 21, 1962, two of the police officers made a routine visit to the premises. On this occasion six persons other than Smulski and Dixon were observed on the premises. The six persons left the premises immediately. The Armstrong and Morning Telegraph were again observed and Smulski again took up a position on the outside and the same activities occurred when persons attempted to enter the Club. On one occasion an unknown man asked Smulski what the lucky number was for the day, and Smulski replied that the police were inside. Dixon told one of the police officers that he had been always treated fairly by the police; that "if he gets caught by the police its okay with him because the police are only doing their job, and that he knows what type of business he is in". The police officer told Dixon, "We don't try to pick on you either Archie because this isn't the only bookie joint in town" and Dixon replied, "That's right". The police officer observed that the telephone was sitting sideways on the cradle, making it impossible for it to ring. Once again Smulski entered the premises as the police left.

On November 23, 1962, at 1:50 P. M. the police officers made another routine visit. The same condition was observed with respect to the telephone and the same course of conduct with respect to the unknown visitors. Dixon, Smulski, and the others left when the police entered. The police made a similar visit on November 26, and found the same general conditions to exist that existed on prior visits.

On November 30, one of the police officers had the premises in question under observation from 10:30 A. M. to 10:45 A. M. He observed eight persons entering the premises, stay for a few minutes, and then leave. The same condition was observed about 12:50 P. M. on the same day.

The defendants Henry P. Gibbons, Archie Dixon and Stanley Smulski are known to have a reputation for participation in receiving and recording of horse bets. The premises in question are known to have a reputation as a place where horse bets are received and recorded. The police officers then recited the same general explanation of the method of operation as has been described in connection with the Amato case.

The defendant Archie Dixon filed an affidavit in which he states that he has no police record evidencing a conviction for violating the gambling laws of this State. He says that he knows of no operation, management or conduct of any person at 217 Maryland Avenue which has resulted in an arrest and conviction under the gambling laws of the State of Delaware. The defendant Smulski, has filed an affidavit which for our purpose is identical with that which was filed by Dixon. Gibbons filed nothing.

The State filed a reply affidavit by one of the police officers in which it is stated that to the best of the police officer's knowledge or belief neither Dixon nor Smulski has any gainful employment; that on numerous occasions he has observed them in the premises of 217 Maryland Avenue between the hours of 11:00 A. M. and 6:00 P. M.

It is stated that the premises at 217 Maryland Avenue consist of a room of approximately 10 x 14 with a counter near the westerly wall having a telephone, radio, and racing publications thereon. There is also a pinball machine and five eating booths as well as a water fountain. There was no food or refreshments and no sign of any entertainment other than the pinball machine which the police officers did not see in use.

The next case involves *State v. Joseph DiRosa, Daniel Marucci, Albert DiSalvo, Michael Benicky, Angelo Marabito, Eugene Smallwood* and *Daniel M. Delcollo*. The complaint alleges that illegal

gambling is taking place at 212 West Seventh Street, Wilmington. The defendants are all alleged to live at places other than 212 West Seventh Street. It is alleged that the tax records of the City of Wilmington show that 212 West Seventh Street is owned by Daniel M. Delcollo.

In support of its application for a preliminary injunction the State has filed a joint affidavit of two police officers of the City of Wilmington. Its relevant terms may be summarized.

On November 13, 1962, at 1:35 P. M. the police officers made a routine visit to 212 West Seventh Street. They rang the doorbell and the defendant Daniel Marucci came to the front door, peeked out and began flicking the lights. The police overheard him shout, "police, clean it up". After about a minute's delay the police were admitted through the front door which is reinforced by a large sliding type bolt. Upon entering they observed the defendants, Albert Di-Salvo, Michael Benicky, Angelo Marabito, and Joseph DiRosa. All of the above named parties have a general reputation in the community of being bookmakers. The police asked who was the operator of the place, and DiRosa said he was. DiRosa had an Armstrong Daily News Review in his rear pocket. While the police were there, the telephone rang six times and on each occasion the defendant DiRosa told the caller to call back later. During the fifteen minutes the police were there, they observed no activities at the premises.

On November 19, 1962, at 12:50 P. M. three police officers pulled up in front of the premises and observed Daniel Marucci standing on the steps talking to Albert DiSalvo. The front door was open. Two of the police officers got out of the car and ran to the front of the building. Marucci began shouting "police" and tried to slam the door on them. When they entered the premises, the police observed DiRosa in the rear wiping something from the wall next to the telephone. The police observed Benicky, Angelo Marabito, and seven other persons sitting around idly at the premises. The telephone rang six times and DiRosa answered and in effect on each occasion told the caller to call back later. Police were there about ten minutes, and there was no activity at the time.

On November 21, 1962, at 2:05 P. M. police again made a visit to the premises. They were admitted after about a minute's delay by Daniel Marucci, and after he shouted "police, clean up". They found seven persons sitting around doing nothing. They included the defendants, Michael Benicky and Angelo Marabito. Joseph De-Rosa talked with one of the police officers and referred to an arrest of a woman on a policy charge in which a large sum of cash was seized. DiRosa stated that there must be a bigger percentage in numbers than in horses. On this occasion the telephone rang ten times and each time DiRosa told the caller "not now" or "call back later".

On November 23, 1962, at 1:35 P. M. the police officers visited the same premises. They were admitted by Marucci after about the same delay and after he had flicked the lights. They observed ten persons sitting around doing nothing. They again visited the premises on November 26 and found the same conditions as on the earlier occasions.

On November 30, 1962, the police had the premises under surveillance from 10:30 A. M. to 2:00 P. M. and observed Marucci and DiRosa about the premises. They also observed Angelo Marabito come from the Shipley Social Club and enter 212 West Seventh Street. The defendant Gene Smallwood also made two trips from the Shipley Social Club to the premises. During the period of surveillance, twenty persons entered and left.

The premises in question are known to the police to have a reputation as a place where horse bets are received and recorded. The affidavit then contains an explanation of the general method of bookmaker operations as previously given.

The only affidavit in opposition to the application for a preliminary injunction in this case was filed on behalf of Angelo Marabito who avers that he has no right, title or interest whatsoever, in and to the premises known as 212 West Seventh Street or in the personal property located on such premises; that he believes that the premises are owned by Daniel M. Delcollo, one of the other defendants. Finally, he states that he has neither frequented nor used the said premises

for illegal gambling activities, and has not maintained, and/or aided and abetted in maintaining any nuisance therein.

The State submitted a reply affidavit by a police officer in which it is stated that on November 21, 1962, Marabito stated to the police officer that he couldn't understand how a named person who had been arrested on the previous day on a "numbers" charge had accumulated $45,000. "I should have gotten into numbers years ago because there's not that kind of money in horses." This statement was made on the premises at 212 West Seventh Street. The police officer states that it is his belief that Marabito has no gainful employment although he maintains a home and supports a family at a given address.

What is the picture presented by the record in these cases? I first consider 500 North Lincoln Street. If one starts with the presumption that a legitimate club is operated there, are the undisputed facts in this record incompatible with such a presumption? We find that on numerous visits the police officers were delayed in being admitted to the Club. The doorway is constructed in such a way, even with due allowance for security, that can only warrant the inference that it is intended to prevent ready access by anyone deemed unwelcome. Once inside we have a picture of people sitting around idly in the middle of the day with no particular entertainment other than card playing available to them. We find the telephone ringing incessantly. While the police are there, the defendant answering the phone gives the most inane responses to the caller, and indeed, is so exasperated on occasion that he even jokes with the police about the obtuseness of the caller. This same general picture was repeated on each of the several visits by the police. We also find that the place has a reputation as a place where horse bets are received and most of the defendants have a reputation as bookmakers. We find that although it is a "club", on each occasion when the police were present, all persons were denied admission. The description of the present method of bookmaking operations is such as to explain the apparent absence of paraphernalia which might otherwise be evidence of bookmaking.

Against this background we have the affidavits of some of the defendants in which they say only that no arrests have ever been

made at 500 North Lincoln or in connection with the Club. One of the defendants states that he has never been arrested under, or convicted of violating, the gambling laws of the State.

First of all, these responses of course do not meet or attempt to explain the many concrete facts which have been set forth in the affidavit filed on behalf of the State. They are of course relevant, but the substance of them may be explained as much by good luck and modern operational techniques as by anything else.

I realize that mere suspicion is not an evidentiary substitute for proof; nevertheless, I conclude that the affidavits justify but one reasonable hypothesis on this record and that is that the premises at 500 North Lincoln Street are being used for betting on horse races—illegal gambling, and that the defendants' conduct comes within the nuisance definition in the statute. I say this because the cumulative effect of the description of operation, the reputations of the places and the parties, plus the activities of the defendants in the setting cannot be deemed to be consistent with some other reasonable explanation. Indeed, none is suggested. While the owner of the property is not charged with knowledge of the illegal activity, such is not required by § 7102.

I turn now to 217 Maryland Avenue. Once again we find the police visiting this so-called club on numerous occasions and finding a similar pattern on each visit. We find several people sitting around reading the daily racing publications. The person in charge at the time would take the phone off the hook and it would remain off the hook during the entire time the police were present. When the police arrived one of the persons working at the Club would immediately go outside and turn away all persons seeking admittance. Certain statements were made by one of the defendants which, to say the least, had a "bookmaking" flavor about them, even if they did not rise to the dignity of "admissions" under the statute. Indeed, one resists the temptation to describe some of these events and conversations in Damon Runyon style. The premises and the defendants both have reputations for bookmaking activity.

Two of the defendants filed affidavits in which they state that they have not been convicted of violating the gambling laws of the

State and they know of no operation or conduct of any person at 217 Maryland Avenue which has resulted in a conviction under the gambling laws. The State filed a reply affidavit in which it alleged that to the best of the police officers' knowledge and belief neither of the defendants who filed affidavits has any gainful employment and both have been seen on numerous occasions at 217 Maryland Avenue.

Once again, when we consider the cumulative effect of the various undisputed facts mentioned above, and consider that either no position or only a limited position was taken by the defendants, it must be concluded that the only reasonable inference is that the premises at 217 Maryland Avenue are being used for illegal gambling on the horses and the defendants' conduct comes within the nuisance definition in the statute.

I next consider the case involving 212 West Seventh Street. I find once again that the police visited the place in question on several occasions and found the same general condition to exist on each visit. Passing over the fact that it had an unusually heavy bolt on the door, the fact is that on each occasion the police were delayed before they could enter. The person answering the door always gave some signal either by flicking the lights or shouting to the defendants inside that the police were present, actions hardly compatible with a legitimate operation. We also find that the defendants operating or frequenting the premises have reputations as bookmakers or gamblers. The premises have what amounts to a general reputation as a place where bookmaking takes place. We find that the phone rang quite frequently. The answers given justify the inference that the callers were being "put off" because of the presence of the police. Some of the statements made by some of the defendants while at the 212 West Seventh Street address, even if not technically admissions, suggest more than casual exposure to the type of illegal activity with which they are charged.

The only affidavit filed in opposition to the petition was filed on behalf of Angelo Marabito who stated that he had no interest in the premises or the personal property located thereon. The fact is that the State does not allege that he has any such interest. Next, Marabito states that he neither frequented nor used the premises for illegal

gambling activities and has not maintained and/or aided or abetted the nuisance therein. Marabito does not deny that he has frequented the premises at 212 West Seventh Street. What he says is that he has not used the premises for illegal gambling activities. When you consider his statement to the police, the undisputed claim that he does not have any gainful employment, yet maintains a home and family, and the fact that he is known to be a professional gambler, the court is reasonably justified in concluding that his presence on the premises cannot be divorced from the illegal activity which I infer is there taking place. Additionally, under the language of 10 *Del.C.* § 7102, it would seem that a person who uses a place which is found to be a nuisance is guilty of maintaining a nuisance and is subject to the injunctive provisions of the statute.

The only reasonable inference to be drawn is that illegal betting on the horses is taking place at 212 West Seventh Street and that the defendants' conduct comes within the nuisance definition in the statute.

I therefore conclude that a preliminary injunction in appropriate language should issue in each case restraining the defendants from horse race betting activity on the identified premises. I emphasize that the restraint is limited to betting on horse races because I think the State's papers only support an injunction in that area.

Present order on notice.