The STATE of Delaware, on the relation of David P. BUCKSON, Attorney General of the State of Delaware, Plaintiff,

v.

Samuel SPOSATO and Antoinetta DiMaio, Defendants.

Court of Chancery of Delaware.

New Castle.

Nov. 17, 1967.

Stephen B. Potter and Hiram W. Warder, Asst. City Sols., for plaintiff.

Victor F. Battaglia, Wilmington, for defendant Samuel Sposato.

DUFFY, Chancellor.

The question for decision is whether an order should issue under 10 Del.C. § 7106 (e) perpetually enjoining defendant Samuel Sposato from maintaining illegal gambling, contrary to 11 Del.C. § 669, anywhere within the State of Delaware.[1]

A.

On October 16, 1963 the State of Delaware filed a complaint under 10 Del.C. §

---

1. 10 Del.C. § 7106(e) provides:
   "If the existence of [a] nuisance is established upon the trial, a judgment shall be entered which perpetually enjoins the defendants and any other person from further maintaining the nuisance at the place complained of, and the defendants from maintaining such nuisance elsewhere within the State."

7103 for an order enjoining Sposato from maintaining any gambling contrary to 11 Del.C. § 669 at 619 North Madison Street, Wilmington, and elsewhere in the State. Sposato leased part of the Madison Street premises from Antoinetta DiMaio Rodolico, who was also named as a defendant. On the basis of the verified complaint, the Court issued a temporary restraining order prohibiting removal of the contents from the premises. 10 Del.C. § 7105. After affidavits were filed and defendants answered, the Court held a hearing and on November 14, 1963 issued a preliminary injunction restraining Sposato from conducting illegal gambling (receiving and recording horse bets) at 619 Madison Street. Acting on a stipulation of the parties, the Court, on December 10, 1963, issued an injunction permanently enjoining Mrs. Rodolico from leasing the first floor of the premises to anyone for conducting any gambling activity contrary to 11 Del. C. § 669 and the State abandoned any further relief as to her.

On December 16, 1963 Sposato filed a notice of appeal to the Supreme Court, and under date of June 24, 1964 the record and a certified copy of a dismissal of the appeal (on a stipulation of the parties) were returned to this Court.

A final hearing was held under 10 Del.C. § 7106 before Chancellor Seitz on June 21, 1966. Briefs were filed thereafter, but because of the limited time available Chancellor Seitz notified counsel on July 15, 1966 that he would not decide the matter.[2] In accordance with his suggestion the parties later stipulated that the transcript, with the briefs and memoranda, should serve as the basis for decision in the case. This was approved by the Court on August 2, 1966.

On September 13, 1966 Sposato advised the Court that he was willing to consent to the entry of an order [presumably final] continuing the injunction which had already issued but he opposed the entry of a State-wide injunction. When the State applied for such an order Sposato requested an opportunity to file an additional brief. This was permitted, and thereafter both sides filed additional briefs after delays and "invitations" from the Court.[3]

\* \* \*

The facts are discussed in relationship to Sposato's arguments.

### B.

In his briefs Sposato makes several contentions which are considered *seriatim*:

(1) The entry by the police to 619 Madison Street was unlawful.

(2) There is a lack of competent credible evidence to support the State's case.

(3) The provisions of 10 Del.C. § 7101 violate the Federal and State Constitutions.

(4) 10 Del.C. § 7101 does not authorize the issuance of injunctive relief prohibiting Sposato from engaging in gambling anywhere in the State.

\* \* \*

### (1) *The entry by the police*

The police officers testified that during the period between September 11 and October 4, 1963, Sposato's premises at 619 Madison Street were visited by them on several occasions, each time in the early afternoon. They did not have a search warrant on any visit. Their testimony is the only evidence of what took place.

2. Chancellor Seitz resigned to accept appointment to the United States Court of Appeals for the Third Circuit.

3. Other cases with comparable issues are pending in this Court (C.A. Nos. 1707, 1708, 1709). On application the Court also gave counsel in those cases an opportunity to brief some of the questions. Robert B. Walls, Esquire, attorney for Michael Benicky, a defendant in C.A. No. 1709, filed on June 30, 1967 a brief in support of a motion to dismiss the complaint, and I have had the benefit of certain arguments made therein.

Sposato contends that police entries into the premises were without color of right and that any evidence flowing therefrom must be suppressed because it was obtained in violation of his rights under the Federal and State Constitutions.

■ Evidence seized in violation of the constitutional prohibition against unreasonable searches and seizures, Art. 1 § 6, Del.C., is not admissible in this State at the trial of the person whose rights have been violated. Schaffer v. State, Del., 184 A.2d 689 (1962).

The evidence offered by the State did not result from a "search" or "seizure" as those words are ordinarily defined. It is true that on one occasion photographs were taken of the interior of the premises and at other times a pillow was lifted from a chair and a racing paper which had been under it was examined. But no objects of any kind were offered in evidence, so there are no tangible fruits of search to suppress or exclude from consideration. I therefore take Sposato's argument to be an objection to receipt of evidence as to what the police saw and observed while they were on the premises.

Assuming that the constitutional provision against unreasonable searches and seizures is applicable here for the purpose Sposato contends, I am satisfied that the undisputed testimony in the record does not establish a violation of Sposato's rights under either Article 1 § 6 of the State Constitution or of the Fourteenth Amendment of the Federal Constitution.

The officers who entered were well known to Sposato, and he to them. One or more of them had, indeed, been in other premises which he had occupied prior to the dates here in question.[4] Without repeating all of the testimony, it seems fair to say that on three of the occasions the police officers either knocked at the door or rang the bell and were admitted by Sposato, who "grunted", left the door open and returned to his desk in the center room of the first floor. On another occasion the door was open and the police walked in. But on no occasion was any objection of any kind registered to their presence.

While Sposato's "invitation" to enter on each occasion when he opened the door may have lacked some of the amenities which characterize more welcome reception, the test is not how warm the welcome, not how gracious the host. It is rather, did Sposato, knowing what he knew about the police officers, freely consent to their entry?

■ Given the "relationship" between the officers and Sposato, including his knowledge of their identity, the inescapable conclusion is that he implicitly consented to their entry on each visit. On the one occasion when the officers walked through the open door the events which occurred thereafter followed the same pattern as when

4. On the question of Sposato's knowledge of the police officers and his prior "relationship" with them, the following testimony, which may seem more Runyonesque than real, was given by Officer Valiante on cross-examination:

"I was at the 607 [Madison Street, previously occupied by Sposato] premises, and I was admitted to the premises. It was raining that day. I had my rain gear on, and I was in uniform. Mr. Sposato was also seated behind a desk with the glass top, sponge and everything and telephone. I sat down in a chair to the side, and an unknown white male came in and approached Mr. Sposato. As he got approximately two feet from the top of the desk, Mr. Sposato jumped up and pointed to me and yelled, 'That's a cop.' I said, 'Well, what did you do that for, Sam?' He said, 'Well, people often come in here looking for police officers.' I says, 'Well then, considering this is my district, I ought to stop by here more often.' And he grunted again."

That took place about a year prior to September 10, 1963 and I have no doubt in my own mind that when the police officers entered 619 North Madison Street Sposato knew exactly who they were and what their purpose was when he admitted them.

Sposato opened it. I see no reason for distinguishing the situations. Under the circumstances, I am satisfied that Sposato's consent to the entries was unequivocal, specific, and intelligently given within the requirements laid down in the State decisions and the only Federal case on which he relies. See United States v. Elmer William Enderlein, Cr.A.No. 1597 (D.Del.).·

(2) *The competent credible evidence*

The evidence offered at the hearing is of two different types: (a) the testimony of three police officers (Kenneth L. Miles, Nicholas M. Valiante, Paul W. Coen) as to their observations at 619 Madison Street and their "expert" testimony as to the way in which certain types of bookmaking operations are conducted; and (b) the reputation of 619 Madison Street.

619 North Madison Street is a two-story building with three rooms on the first floor which were apparently leased to Sposato. The first room contained a sofa and lounge chair, the middle room a table or desk with a glass top, a sofa and several chairs. The rear room was equipped as a kitchen but did not appear to have been used as such.

On the glass-top table in the middle room were a telephone, a grease (white lettering) pencil and a damp sponge. Racing papers were in the room..

During each visit by the officers the telephone rang about twice, Sposato answered it, engaged in a brief conversation which ended when he said, "Call me back" or "I'll see you later" or something of that nature.

On one occasion, according to Officer Valiante,

"Mr. Sposato was sitting there, and he was drawing lines up and down on the glass, sort of looking disgusted. I asked him why the waxed—the white lead pencil and the damp sponge and the desk, and he said, 'Well, I like to draw pictures.' He doodled a little bit. He said, 'When I make a mistake, I wipe them off.' "

As to the manner in which bookmaking is conducted in certain types of establishments, Officer Valiante adopted as his testimony an affidavit which he had filed, reading as follows:

"* * * [An] explanation or method used in this city by the operators of House Betting Parlors:

The hours that these establishments open up are generally from 11:00 A.M. to 6:00 P.M. These hours coincide with the running of Race Tracks throughout the country.

The bookmaker or the operator of these establishments will allow only known and trusted horse players into their place of business. They generally employ a door man or look-out man, whose duties consist of constantly looking out for the police and admitting only known customers. Usually there are several locked doors leading into these establishments.

The equipment or paraphernalia needed and used in the bookmaking establishments consist of racing papers and other newspapers that carry the results of and prices paid by various Horse Race Tracks.

In the receiving of bets under the present conditions, the bookmaker either bet down on a small slate of marble, or a piece of glass, or some other similar object that can be easily erased or wiped off by a damp cloth or sponge (should the police arrive). When the bookmaker accumulates several bets, he telephones these bets out to a confederate or recorder, who in turn makes a record of the bets and the amounts bet and the name or initials of the bettor.

Currently, many bookmakers do not even write anything down, they operate by keeping an open phone, whereupon they immediately relay the bet received to the Recorder. The location of the recorder is only known to the bookmaker and al-

though the bookmaking parlor may be located in the city, the recorder and the only evidence for gambling can be located in the County or the State. This method of operation makes the arrest of the bookmaker or operator of these establishments virtually impossible."

■ Sposato argues about what the police did *not* see at 619 North Madison Street: an open phone, much foot traffic, a lookout, barricades and so on. All such negative evidence has a relevancy but not a persuasive materiality. That which *was* seen does have. And here I note that evidence as to the observations was uncontroverted and challenged only as to the inferences to be drawn from it. In my judgment, the only reasonable inference to be drawn from the evidence is that Sposato was engaged in the operation of a "horse betting parlor" as described by the police witnesses. The evidence shows a unity of time, place and circumstance for the enactment of a single activity: "horse betting". In short, there is no other reasonable inference to be drawn and the test described in State ex rel. Bove v. Amato, 41 Del.Ch. 91, 188 A.2d 243, has been met.

In view of my conclusions as to the circumstantial evidence, it is not necessary to consider the testimony as to reputation.

(3) *10 Del.C. § 7101 and the Constitutions*

In caption and by invoking the right to a jury trial, Sposato appears to be making a frontal attack on the constitutionality of the entire Act under which jurisdiction to enjoin and abate a nuisance is conferred upon the Court of Chancery. But he concedes that all authorities agree that equity always had concurrent jurisdiction with the law courts to restrain a nuisance dangerous to public health, even though the nuisance was criminal in character. I therefore take his argument to be that "illegal gambling" (10 Del.C. § 7101) is not a nuisance of the kind as to which equity has concurrent jurisdiction.

■■ First, it is a doctrine of the widest acceptance that an equity court has jurisdiction to restrain existing or threatened public nuisances by injunction at the suit of the Attorney General or some other proper officer representing the State. 4 Pomeroy's Equity Jurisprudence (5 ed.) § 1349. And that jurisdiction is not affected by the fact that the creation or maintenance of a nuisance is a crime. In many States such power is exercised without benefit of a statute. And the constitutionality of a statute conferring on an equity court a power to abate a public nuisance, even though it be a crime, has been upheld in many jurisdictions. See the annotations at 5 A.L.R. 1474; 22 A.L.R. 542; 75 A.L.R. 1298. There is some dissent from this view which is reflected in Hedden v. Hand, 90 N.J.Eq. 583, 107 A. 285, 5 A.L.R. 1463 (1919). But I am not persuaded by that reasoning, particularly in the light of this Court's ruling in State ex rel. Buckson v. Amato, Del.Ch., 213 A.2d 53 (1965), in which this Court upheld parts of the statute against attacks based on the constitutional privilege against self-incrimination and the absence of due process.

Second, although Sposato makes no analysis of the illegal gambling here charged in terms of the common law definition of nuisance on which he relies, I am satisfied that this statute falls within that definition.

■ "Nuisance" is defined in the statute as a place in which, among other things, "illegal gambling" is conducted. The gambling here charged is made illegal by 11 Del.C. § 669, which deals with betting, recording bets, keeping recording equipment, and the like. At common law a public nuisance involved conduct which produced material annoyance, inconvenience, or discomfort. And a gambling house is usually considered to be such a nuisance *per se* because of its tendencies to bring together disorderly persons and to lend to breaches of the peace. 66 C.J.S. Nuisances § 48b. The maintenance of an illegal gambling house, wherein the activities violating 11 Del.C. § 669 are conducted, is a public nuisance.

I should here note that Sposato has not cited any Federal authority in support of his contention that the Act violates the Federal Constitution. And as to Hughes v. Hanna, 39 Fla. 365, 22 So. 613 (1897), that case involved an equity action to remove a cloud on title to real estate under circumstances which had previously been triable by a jury. The court found only a change in the form of the action and hence no basis for Chancery jurisdiction. The case is of no help here.

Finally, I should note also the opinion in State v. Mancari, Del., 223 A.2d 81 (1966), in which the Supreme Court commented upon, but did not decide, the right to a jury trial under 10 Del.C. § 7109. That statute provides, in part:

> "In case of the violation of any injunction or closing order granted under the provisions of this chapter, or of a restraining order, or the commission of any contempt of court in proceedings under this chapter, the Court of Chancery may summarily try and punish the offender."

I do not regard the constitutionality of this section as being before me on this post-trial decision which is concerned solely with whether a State-wide injunction should issue against Sposato. To get into the penalty provisions now would look down the road to a contempt proceeding not yet started and the violation of an order not yet entered. And it would require a consideration of cases neither briefed nor argued.

(4) *Injunctive relief under 10 Del.C. § 7107*

■ Sposato argued that a State-wide permanent injunction is not authorized under 10 Del.C. § 7101 but concedes that the decision of this Court in State ex rel. Buckson v. Amato, supra, is to the contrary. Sposato's argument on this issue is therefore without merit.

\* \* \*

A permanent injunction will be issued under 10 Del.C. § 7106(e).

Order on notice.